## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BRANDY KANE, | ) |
| | ) |
| Plaintiff, | ) 2:15-cv-00846 |
| | ) |
| v. | ) Judge Mark R. Hornak |
| | ) |
| SHAWN BARGER, in his individual | ) |
| capacity, | ) |
| | ) |
| Defendant. | ) |

## **OPINION**

**Mark R. Hornak, United States District Judge**

Plaintiff Brandy Kane alleges that Defendant Officer Shawn Barger of the Coraopolis Police Department violated her right to bodily integrity under the Fourteenth Amendment to the United States Constitution during his investigation into whether Kane was the victim of a sexual assault. Barger filed a Motion for Summary Judgment, ECF No. 48, arguing that his conduct, even when viewed in a light most favorable to Kane, did not rise to the level of an invasion of bodily integrity. Barger also asserts the affirmative defense of qualified immunity.

For the reasons that follow, Barger's Motion for Summary Judgment will be granted on the basis of qualified immunity.

### I. BACKGROUND

In the late evening or early morning hours of June 26 and 27, 2013, multiple Coraopolis police officers were dispatched to a location on Fourth Avenue in Coraopolis, Pennsylvania in response to a reported domestic disturbance at Brandy Kane's boyfriend's residence, where Kane lived. ECF No. 50-1 at 4, 21, 24; ECF No. 50-2 at 5; ECF No. 61 at 128-29. There they found Kane walking in the street. ECF No. 50-2 at 5. She was emanating a potent odor of alcohol stemming from her consumption of several drinks of hard liquor. ECF No. 50-2 at 5; ECF No. 61

at 158. Kane was wearing bikini bottoms and an oversize white t-shirt; the t-shirt did not belong to her. ECF No. 50-1 at 10; ECF No. 61 at 160. At the time, Kane was 20 years old. ECF No. 50-1 at 3; ECF No. 51 at 1 ¶ 2; ECF No. 55 at 2 ¶ 2.

Kane was arrested, taken to the Allegheny County Jail, and charged with disorderly conduct, underage drinking, resisting arrest, and escape. ECF No. 51 at 2 ¶ 11; ECF No. 55 at 2; ECF No. 50-1 at 10; ECF No. 61 at 160-62. Due to her alcohol consumption (possibly in combination with her prescribed anti-depressant medication), Kane was "blacked out"; she does not recall the events that transpired between when she began drinking at her boyfriend's residence and when she came to in a squad car on the way to the Allegheny County Jail. ECF No. 50-1 at 21-23, 30-31; ECF No. 61 at 158. Sometime after her arrest, Kane realized that she had a lump on the back of her head, bruising on her forearms, bruising or scrapes on both of her legs behind her knees and on her calves, bruising on the back of her left shoulder, and possibly light bruising on her chest. ECF No. 51 at 2 ¶ 13; ECF No. 55 at 2; ECF No. 50-1 at 10, 15; ECF No. 61 at 159-60.

At Noon on June 27, 2013, Kane was released from Allegheny County Jail. ECF No. 51 at 2 ¶ 15; ECF No. 55 at 2; ECF No. 50-1 at 11; ECF No. 61 at 168-69. A hearing was scheduled for her pending criminal charges. ECF No. 61 at 213. That hearing was initially set for July 2, 2013, but it was continued multiple times. ECF No. 61 at 213-14. Kane was ultimately adjudicated guilty of disorderly conduct and underage drinking but not guilty of resisting arrest and escape. ECF No. 61 at 214.

When she was released from the Allegheny County Jail, Kane was concerned that she might have been sexually assaulted because she was not wearing pants when she was arrested, she had a large amount of vaginal discharge with an unusual odor, her vagina was irritated, and she could not recall what happened. ECF No. 50-1 at 14; ECF No. 50-4 at 12; ECF No. 61 at 162, 174-75. Kane spoke with her criminal defense attorney, who suggested that she go to the hospital to

receive a psychiatric evaluation. ECF No. 61 at 169. After showering at her mother's house and having a friend take photographs of her bruising, Kane went to Sewickley Valley Hospital at around six or seven o'clock on the evening of June 27, 2013. ECF No. 51 at 3 ¶ 15-16; ECF No. 55 at 2; ECF No. 50-1 at 13, 20; ECF No. 61 at 169, 197-98. At the hospital, Kane requested both a psychiatric evaluation and a sexual assault examination. ECF No. 51 at 3 ¶ 17; ECF No. 55 at 2; ECF No. 50-1 at 13-14. As part of the sexual assault examination, a hospital doctor or nurse photographed Kane's arms, her shoulder, the back of her knees, and her legs. ECF No. 50-1 at 14, 42-43; ECF No. 61 at 175-76, 292.

Although it was both official protocol and common practice for the Coraopolis Police to refer sexual assault investigations to the Allegheny County Police (ECF No. 55 at 9 ¶ 36(vi); ECF No. 63 at 3 ¶ 36(vi); ECF No. 50-6 at 4; ECF No. 61 at 19, 95), Officer Shawn Barger, a Coraopolis police officer, was dispatched to and arrived at the hospital purportedly to investigate Kane's possible sexual assault. ECF No. 51 at 3 ¶ 18; ECF No. 55 at 2 ¶ 18; ECF No. 50-1 at 15. Barger was forty years old. ECF No. 55 at 7 ¶ 36(i); ECF No. 63 at 1 ¶ 36(i).

The parties dispute whether Officer Barger was assigned to investigate Kane's possible sexual assault. ECF No. 51 at 3 ¶ 18; ECF No. 55 at 2 ¶ 18. Barger's report indicates he was contacted by Sewickley Valley Hospital. ECF No. 61 at 435. Barger now says he was initially assigned to the case by a police dispatcher because he was the officer in charge that night. ECF No. 50-6 at 4; ECF No. 61 at 18-19; ECF No. 61 at 21. According to then-Police Chief Alan DeRusso, this would have been standard procedure. ECF No. 61 at 89. Barger claims that he asked a dispatcher to inform the Allegheny County Police about the incident so that they could provide support. ECF No. 50-6 at 4; ECF No. 61 at 18-19. Barger also says, and his incident report reflects, that he spoke with Allegheny County Detective Adams, and Adams told Barger to conduct an initial interview Kane regarding Kane's possible sexual assault to determine if, in fact, an assault

3

took place, and that an Allegheny County investigative team would then be assigned. ECF No. 50-6 at 4-5; ECF No. 50-4 at 12; ECF No. 61 at 22-23. In any event, Barger considered himself the lead investigator on Kane's case. ECF No. 50-6 at 5.

On the evening of June 27, 2017, Officer Barger collected the hospital's rape kit as evidence. He later transported it to the Coraopolis Police Station, where he placed it in a secure evidence refrigerator. ECF No. 50-6 at 11; ECF No. 50-4 at 12. Barger then interviewed Kane concerning her possible sexual assault. ECF No. 50-1 at 15-16. Kane's mother and a victim advocate were present. ECF No. 50-1 at 16. Kane says that Barger told her to come to the police station the next day and provide him with the clothing she had been wearing during the incident. ECF No. 50-1 at 16. In his incident report, Barger stated that Kane told him she would put the clothes she was wearing during the incident in paper bags and bring them in to the station the next day. ECF No. 50-4 at 13.

The following day, on June 28, 2013, Kane and one of her friends, Cayla Combs, went to the Coraopolis Police Station. ECF No. 50-1 at 16; ECF No. 50-3 at 20-21; ECF No. 50-4 at 13; ECF No. 61 at 47-48. The parties dispute whether Kane initiated the trip to the police station to retrieve her cell phone or whether she did so because Officer Barger had directed Kane to come to the station to provide him with evidence—the clothing in her possession after her possible sexual assault (bikini bottoms, a pair of shorts, and a T-shirt). ECF No. 51 at 3 ¶ 19; ECF No. 55 at 3 ¶ 19; ECF No. 50-1 at 16, 43; ECF No. 50-6 at 11; ECF No. 50-3 at 20-21. In any event, Kane both retrieved her cell phone from the station and provided the clothing from the night prior to Barger. ECF No. 50-1 at 17; ECF No. 50-6 at 9; ECF No. 50-4 at 13.

While at the Coraopolis Police Station, Kane and Combs met separately with Officer Barger to discuss Kane's possible sexual assault. ECF No. 50-1 at 16; ECF No. 50-3 at 21; ECF No. 51 at 3 ¶ 20-21; ECF No. 55 at 3 ¶ 20-21; ECF No. 61 at 182-84. Kane and Barger met alone

4

in a back room of the station, which had at least one table or desk. ECF No. 50-1 at 16; ECF No. 50-6 at 13; ECF No. 61 at 99-100. Barger says he was the one who directed Kane to the back room. ECF No. 61 at 48-49. Kane says the door to the hallway was closed; Barger says it was open. ECF No. 50-1 at 16; ECF No. 50-6 at 13; ECF No. 50-7 at 11.

During Kane's meeting with Officer Barger, Barger asked Kane at least once whether she had any bruising on or around her intimate areas. ECF No. 55 at 10 ¶ 36(viii); ECF No. 63 at 5 ¶ 36(viii). Kane reported a bruise on her upper right buttock. ECF No. 51 at 4 ¶ 27; ECF No. 55 at 5 ¶ 27; ECF No. 50-1 at 17. Kane then told Barger that the hospital had taken photographs of all of her injuries except for the bruise on her right buttock. ECF No. 50-1 at 17; ECF No. 50-7 at 11; ECF No. 61 at 185-86. Barger then asked Kane if he could photograph the bruise on Kane's right buttock.[1] ECF No. 50-1 at 17, 43; ECF No. 50-7 at 11-12; ECF No. 61 at 186, 294. Barger would later explain that he did so solely for evidence documentation purposes. ECF No. 61 at 347.

Officer Barger claims, and his report reflects, that he tried to power up the Coraopolis Police Department's digital camera, but the Department's camera was not working. ECF No. 50-6 at 7; ECF No. 50-4 at 13; ECF No. 61 at 29-32; ECF No. 61 at 49-50. According to Barger, that was the only camera in the police station. ECF No. 50-6 at 7. Barger then informed Kane that he had a special application ("app") on his iPhone for taking photographs. ECF No. 50-1 at 17. Kane agreed that Barger could photograph her right buttock. ECF No. 50-1 at 17; ECF No. 50-7 at 12-13. Barger then either photographed or attempted to photograph Kane's right buttock using his personal cell phone, a black iPhone. ECF No. 55 at 10 ¶ 36(xi); ECF No. 63 at 6 ¶ 36(xi); ECF No. 50-1 at 6-7, 16-17; ECF No. 50-6 at 6-7. Kane then asked Barger if he wanted to take

---

[1] This would be the third set of photographs; the first being those taken by Ms. Kane's friend, the second by the staff at the hospital.

photographs of her other injuries besides the bruise on her right buttock, and Barger replied that he did. ECF No. 50-1 at 17; ECF No. 50-7 at 12-13; ECF No. 61 at 186-87.

Kane says that Officer Barger asked her repeatedly about her breasts, vagina, and buttocks while holding his personal cell phone and photographing her. ECF No. 50-1 at 6-7; ECF No. 50-7 at 14-15; ECF No. 61 at 70, 145. Kane says she believes Barger photographed her more than four times and as many as eight times using his personal cell phone (ECF No. 50-1 at 6-7, 19; ECF No. 61 at 145, 194), but she does not know for sure because she did not see any photographs or hear a camera "click" (ECF No. 50-1 at 7, 18; ECF No. 61 at 69, 146-47), nor does she know exactly what areas of her body Barger photographed. But Kane nonetheless believes that Barger took inappropriate photographs of her "intimate areas," including her breasts and buttocks. ECF No. 50-1 at 43; ECF No. 61 at 144, 157, 188, 295-96. Barger made no mention of the fact that he either photographed or attempted to photograph Kane with his personal cell phone in his official report. ECF No. 50-4 at 13-14.

In his deposition, Officer Barger admitted that he attempted to use the evidence collection application on his personal cell phone to take photographs of Kane's injuries. ECF No. 61 at 49, 52, 58-59. Barger denied that he actually photographed Kane, instead describing his attempt as "unsuccessful." ECF No. 61 at 49; ECF No. 50-6 at 12. But Barger also signed a Request for Admission propounded during discovery in this case, agreeing that he "took photographs of Brandy Kane in the Coraopolis Borough Police Station." ECF No. 61 at 5.

In any event, Officer Barger now says that he at least attempted to photograph Kane's bruises. ECF No. 50-6 at 13. Barger says that he attempted to photograph Kane between five and seven times with his personal cell phone, but the photographs would not "save" to his cell phone because the phone would "freeze" and the evidence collection application would delete them. ECF No. 50-6 at 6-7, 12-15; ECF No. 61 at 58-60; ECF No. 63 at 6 ¶ 36(xii). Barger denies that he

6

himself deleted the photographs; he says that when he attempted to review the photographs, they were simply gone. ECF No. 50-6 at 14; ECF No. 61 at 58-59. Barger nevertheless admits that his actual intent was to take photographs on his personal cell phone to document the evidence of a possible sexual assault, and he would have taken such photographs if the evidence collection application had been working properly. ECF No. 50-6 at 14.

Kane says after the first round of photographing with Officer Barger's personal cell phone, Barger told her that the photographs were not saving to the phone, so Barger asked if he could retake the photographs. ECF No. 50-1 at 19; ECF No. 61 at 194. Kane then agreed to allow Barger to retake the photographs. ECF No. 50-1 at 19; ECF No. 50-7 at 17; ECF No. 61 at 194. According to Kane, the second round of photographing involved the same areas of her body. ECF No. 50-7 at 17-18; ECF No. 61 at 194. During this second round of photographing, Kane says Barger again asked her if she had injuries to her vagina, to which she again replied she did not. ECF No. 50-1 at 19; ECF No. 61 at 194-95.

At some point during all of this photographing or attempted photographing, both Kane and Officer Barger together pulled down her grey Adidas basketball shorts far enough to expose the bruise on the upper part of her right buttock. ECF No. 51 at 4 ¶ 27; ECF No. 55 at 5 ¶ 27l; ECF No. 50-1 at 17; ECF No. 50-7 at 13; ECF No. 61 at 187. First, Kane turned around facing away from Barger and began to pull down her shorts. ECF No. 50-1 at 17; ECF No. 61 at 187. Then, Barger assisted Kane, pulling down Kane's shorts a little further in order to fully expose the bruise on Kane's right buttock so he could photograph it. ECF No. 50-1 at 17; ECF No. 61 at 187. Kane says that at that point, she "felt something touch her butt crack" which "caused her to jump." But Barger says he was just moving the tag on the back of her shorts out of the way. ECF No. 50-1 at

7

17; ECF No. 50-7 at 13; ECF No. 61 at 187-88. Barger denies touching Kane. ECF No. 50-6 at 15.[2]

Kane also says Officer Barger asked her to both stand and sit on a table so he could photograph her inner thigh injuries and bruises on the back of her knees. According to Kane, she did both, pulling up the legs of her shorts while sitting to reveal her inner thighs. ECF No. 50-1 at 17; ECF No. 50-7 at 13-14; ECF No. 61 at 146; ECF No. 61 at 188-89. Barger denies asking Kane to get on the table. ECF No. 50-6 at 13. But Kane says that while she was on the table, Barger twice asked her if she would pull up her shorts further, and she complied, pulling her shorts all the way up to her bikini line, while Barger photographed or attempted to photograph her inner thighs. ECF No. 50-1 at 17-18; ECF No. 50-7 at 13-14; ECF No. 61 at 188-89.

Kane says that at one point, when Barger asked again about injuries to her vagina, Kane pulled her shorts to the side to show the officer her vagina. ECF No. 50-7 at 15; ECF No. 61 at 190. Kane says Barger looked at her vagina. ECF No. 50-7 at 15; ECF No. 61 at 190. Kane does not allege that Barger asked her to show him her vagina, nor does she believe that Barger photographed her vagina, but she is not certain about that; Kane says that Barger did make her "feel like" he may have photographed her vagina. ECF No. 50-7 at 15; ECF No. 51 at 4 ¶ 30-31; ECF No. 55 at 6 ¶ 30-31; ECF No. 50-7 at 15; ECF No. 61 at 190-91. Barger has denied that Kane exposed her vagina to him. ECF 61 at 402, 408.

Kane says that when Officer Barger asked about the bruise on her chest, he pulled her tank top down slightly, using his finger to expose the bruise on her upper chest. ECF No. 50-1 at 18; ECF No. 61 at 191. Kane says that she held the tank top in place where Barger had positioned it, and Barger photographed or appeared to photograph the bruise on Kane's chest. ECF No. 50-1 at

---

[2] Barger also denied assisting in pulling on Kane's shorts and tank top as part of his photography process, but it appears he later recanted that, at least as to her shorts. ECF No. 61 at 402, 408. He also initially denied looking at or photographing Kane's inner thighs, ECF No. 61 at 402, but recanted that also. ECF No. 61 at 408.

18; ECF No. 61 at 191. Barger slid the tank top aside a bit to photograph or attempt to photograph the bruise. ECF No. 50-1 at 19; ECF No. 61 at 193. Kane's breasts were never fully exposed during the session, but the upper portion of her chest around the line of her tank top was exposed, ECF No. 61 at 193, and Kane claims at one point that the upper portion of one of her breasts was exposed, but not her nipple. ECF No. 51 at 4 ¶ 28; ECF No. 55 at 5 ¶ 28; ECF No. 50-1 at 19; ECF No. 61 at 192-93.

After Officer Barger photographed Kane, Kane says Barger told her that he would be investigating her case further and that he would call the detectives if anything happened. Kane then left the police station. ECF No. 50-1 at 19; ECF No. 50-7 at 17-18. Barger continued investigating Kane's possible sexual assault for at least some time further. ECF No. 50-4 at 17-18. Among others, Barger interviewed Cayla Combs' sister, Porsha Webb; Kane's boyfriend, Dustin Goins; Georgette Blatz, who had found Barger partially clothed; and Paige Bogatay, who saw the bruising on Kane's body. ECF No. 50-4 at 15-18.

Officer Barger did not document what happened to the bikini bottoms, pair of shorts, and T-shirt that Kane provided as evidence. ECF No. 50-6 at 9. Barger says that he left the clothes in a specific but unspecified location at the police station for the "evidence officer" to collect.[3] ECF No. 50-6 at 9-10. He says he does not know what happened to those evidentiary items after that. ECF No. 50-6 at 9-10; ECF No. 61 at 40-42. The record before the Court contains no chain of custody documentation for those items.

Detective Kuma from Allegheny County Police Department investigated Officer Barger's conduct at Kane's request. ECF No. 61 at 308-09. Kuma reports that he found Kane to be credible. ECF No. 61 at 388. During Kuma's investigation, Barger initially denied photographing Kane

---

[3] Seemingly impairing any "chain of custody" for such evidence.

using his personal cell phone, instead telling Kuma he that did not take photographs of Kane at all. ECF No. 50-6 at 13-14; ECF No. 61 at 55. Barger later admitted to Kuma that he had not been completely honest in regards to what happened with Kane at the station. ECF No. 50-6 at 13; ECF No. 61 at 56-57, 61-62, 346-47. According to Kuma, Barger said that he was not honest about what happened regarding the photography session involving him and Kane because he was afraid his girlfriend would find out and become jealous. ECF No. 61 at 349.

Officer Barger and Detective Kuma disagree about which story Barger eventually settled on. Barger says he later told Kuma that he had attempted to take photographs of Kane on his personal cell phone. ECF No. 61 at 56-58. Kuma believes Barger "lied about whether or not he took the photos." ECF No. 61 at 372. Kuma says Barger later told him that he actually took six or seven photographs of Kane on his personal cell phone with an evidence application after realizing the Department camera wasn't working. ECF No. 61 at 346-47, 366. Kuma says that Barger admitted to actually photographing Kane's upper chest, the side of her buttocks, her inner thighs, and the front and backs of her legs. ECF No. 61 at 347. Kuma says that Barger explained how the evidence application on his iPhone kept freezing up as Barger was taking the photographs. ECF No. 61 at 347. Barger then tried to take photographs with a different iPhone application, and he tried to transfer those photographs into the evidence application. ECF No. 61 at 347. According to Kuma, Barger then told Kuma that he had deleted some of the photographs from his phone, while other photographs never saved to his phone in the first place. ECF No. 61 at 348, 375.

Detective Kuma later conducted a forensic analysis of almost thirteen thousand (13,000) photographs from Officer Barger's cell phone, but he found no photographs that have been identified as depicting Kane or any portion of her body, although he says one photograph could possibly be Kane's buttocks. ECF No. 51 at 4 ¶ 25; ECF No. 55 at 4 ¶ 25; ECF No. 50-7 at 27-28; ECF No. 61 at 341-44, 363, 376. Kuma believes that his analysis would have detected any

10

photographs deleted by Barger after the incident, but he is not entirely sure about this. ECF No. 61 at 338-39, 348. Kuma did not look at metadata from Barger's cell phone. ECF No. 61 at 377. Kuma also did not specifically look for indications of a data transfer, nor did he analyze any of Barger's other devices for photographs. ECF No. 61 at 363-65. So while Kuma was confident after his investigation that Barger had not deleted any photographs of Kane, Kuma agreed it is possible that photographs were taken but never saved in the first place, or that such photographs remained on the phone but were encrypted, or that such photographs were transferred to another device prior to his investigation (though he did not see evidence of those things). ECF No. 61 at 345-46, 363-64, 370. According to Kuma, he has "run into so much inconsistency with [the cell phone analysis] device that I can't say that for sure [whether Barger saved photos of Kane on his phone]. All I can say is of what was extracted from [Barger's] phone, there were no photos that we could tie to Ms. Kane." ECF No. 61 at 348.

Then-Police Chief DeRusso also questioned Officer Barger about the incident. ECF No. 61 at 91-92. DeRusso said that the Department had a longstanding policy that no officer would meet with a female without another officer present. ECF No. 61 at 99. DeRusso explained that he would not have allowed officers to use their personal cell phones to take evidence photographs of alleged sexual assault victims, although he did not recall adding any "photographic equipment policy" to the Department's formal rules, regulations, and procedures manual. ECF No. 61 at 98-99, 110. DeRusso said that he had purchased every single officer in the Department a "smart" cell phone for their police work as well as a Department camera for evidence collection. ECF No. 61 at 92-93, 104-05. Barger was one of the first officers given his own set of this equipment. ECF No. 61 at 93-94.

Officer Barger claims that he no longer had a Department-issued cell phone, that there was only one Department camera for all the officers to use, ECF No. 50-6 at 7, and that he was not

11

aware of any Department policy regarding photographic equipment or photographing a female without another officer or witness in attendance. ECF No. 61 at 32-33. But according to then-Police Chief DeRusso, the policy requiring that two officers be present in a meeting with a female was long-standing, ECF No. 61 at 99, and Barger and other officers would have had their own individually-assigned Department camera at the time this incident occurred, ECF No. 61 at 105, which is why Barger violated Department policy by taking photographs with his personal cell phone rather than the Department-issued camera he was given. ECF No. 61 at 98. If a Department-issued camera were inoperative as Barger claims, DeRusso says he would have expected Barger to report that fact to either DeRusso or a police captain. ECF No. 61 at 105-06.

In any event, at the conclusion of the inquiry by Chief DeRusso, Officer Barger consented to formal disciplinary action for violations of Coraopolis Police Department policies, including failing to use Department photographic equipment, interviewing and photographing a female without a fellow officer or witness present, and failing to provide full initial disclosure of the matter. ECF No. 55 at 11 ¶ 36(xvii); ECF No. 63 at 7-8 ¶ 36(xvii); ECF No. 50-6 at 7-8; ECF No. 61 at 10, 102-03. DeRusso took Barger off of Kane's case "a couple weeks" after questioning Barger. ECF No. 50-6 at 5-6; ECF No. 61 at 25-26. In addition to his formal reprimand, Barger was suspended for two weeks without pay. ECF No. 50-6 at 6; ECF No. 61 at 27.

## II.    **LEGAL STANDARD**

A party is entitled to summary judgment if it can show that there is no genuine issue of material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A genuine issue of material fact is one that 'affects the outcome of the suit under the governing law' and could lead a reasonable jury to return a verdict in favor of the nonmoving party." *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Initially, the moving party bears the burden of

12

demonstrating that the evidentiary record presents no genuine issue of material fact. *Willis*, 808 F.3d at 643. If it does so, the burden shifts to the nonmoving party to "identify facts in the record that would enable them to make a sufficient showing on essential elements of their case for which they have the burden of proof." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If, after adequate time for discovery, the nonmoving party has not met its burden . . . the court must enter summary judgment against the nonmoving party." *Willis*, 808 F.3d at 643. Inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

## III.   ANALYSIS

To state a claim under 42 U.S.C. § 1983, Kane must plead a deprivation of a constitutional right caused by a person acting under color of state law. *Chainey v. Street*, 523 F.3d 200, 219 (3d Cir. 2008). In her Complaint, Kane alleges that Officer Barger, under the cloak of his role as a Coraopolis Police Officer investigating her possible sexual assault, deprived her of her substantive due process right to bodily integrity under the Fourteenth Amendment to the United States Constitution. ECF No. 1. An individual's liberty interest in personal bodily integrity is included within the protections of the Fourteenth Amendment Due Process Clause. *Bridges ex rel. D.B. v. Scranton Sch. Dist.*, 644 F. App'x 172, 176 (3d Cir. 2016).[4] Indeed, "[e]very violation of a person's bodily integrity is an invasion of his or her liberty," *Washington v. Harper*, 494 U.S. 210, 237 (1990) (Stevens, J., concurring in part and dissenting in part), and an "individual's right to bodily integrity is a fundamental right and liberty interest protected by substantive due process." *Logan v. Bd. Of Educ. Of Sch. Dist. Of* Pittsburgh, No. 15-499, 2016 U.S. Dist. LEXIS 172612, at *14

---

[4] *See also Phillips v. Cty. Of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008) (citing *Ingraham v. Wright*, 430 U.S. 651, 672-74 (1977)); *Black by Black v. Indiana Area Sch. Dist.*, 985 F.2d 707, 709 (3d Cir. 1993); *D.R. v. Middle Bucks Area Vocational Tech. Sch.,* 972 F.2d 1364, 1368 (3d Cir. 1992).

13

(W.D. Pa. Dec. 14, 2016) (citing *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)). In order to prevail on her substantive due process claim, Kane must show that Barger deprived her of her right to bodily integrity and that such deprivation "shocks the conscience." *Chainey*, 523 F.3d at 219.[5]

In response, Officer Barger has asserted the defense of qualified immunity. The doctrine of qualified immunity shields government officials "from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). It "protects all but the plainly incompetent or those who knowingly violate the law." *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015). To determine whether a government official is entitled to qualified immunity, courts ask two main questions: (1) whether the facts alleged by the plaintiff show the violation of a constitutional right, and (2) whether that right was clearly established at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Courts have discretion to address either question first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). If the "clearly established" prong is dispositive of the case, a court need not proceed any further. *Id.*

The Court believes that it is appropriate to exercise its discretion to first and principally address this latter question—whether the right at issue here was clearly established—first. *Id.*; *see Camreta v. Greene*, 563 U.S. 692, 705-07 (2011) (district courts should ordinarily forebear resolving the constitutional issue presented, and lower courts should "think hard, and think hard again" before doing otherwise).

The "clearly established" prong has been at the heart of recent Supreme Court qualified immunity jurisprudence. For a government official to have "fair warning" that his or her actions

---

[5] *See also Fagan v. City of Vineland*, 22 F.3d 1296, 1303-1309 (3d Cir. 1994) (citing *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115 (1992)).

violate a person's rights, *see United States v. Lanier*, 520 U.S. 259, 270 (1997), such that the official can "reasonably anticipate" the consequences of given conduct, the contours of the right alleged to have been violated "must be sufficiently clear 'that every reasonable official would [have understood] that what he is doing violates that right.'" *Reichle*, 566 U.S. at 658-59 (quotations omitted). Although it is not necessary to have a case "directly on point," *see Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015), "existing precedent must have placed the statutory or constitutional question beyond debate," *Reichle*, 566 U.S. at 664, and such precedent should be from the Supreme Court, the regional court of appeals (in this case, the Third Circuit), or a "robust consensus of cases of persuasive authority in the [other] Courts of Appeals." *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 248 (3d Cir. 2016). In addition, the Supreme Court has repeatedly and recently cautioned that courts should "not . . . define clearly established law at a high level of generality." *Mullenix*, 136 S. Ct. at 308. "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Id.* (quotations omitted). "This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'"[6] *Id.* (quotations omitted). Qualified immunity is properly applied, for example, where "the result depends very much on the facts of each case," but there are no cases which "*squarely govern*[]" the case at hand. *Id.* at 309; *see also Brosseau v. Haugen*, 543 U.S. 194, 201 (2004) (concluding that qualified immunity is appropriate where an officer's actions fall in the "hazy border" between conduct that violated a right and conduct that did not).

In other words, even if the facts of record demonstrate that Kane could successfully make out a violation of her substantive due process right to bodily integrity, the standard for her claim to survive Officer Barger's defense of qualified immunity is surgically exacting when it comes to

---

[6] The Supreme Court recently reiterated these longstanding principles in a *per curiam* decision addressing the application of qualified immunity in an excessive force case. *See White v. Pauly*, 137 S. Ct. 548, 551-52 (2017).

15

the "clearly established" prong. This Court must apply qualified immunity and enter judgment for Barger unless it concludes that federal law was so clearly established that *every reasonable officer* in Barger's position would have known *at the time* that *Barger's particular conduct* deprived Kane of such right, defined by the Court *with specificity*, such that *existing precedent* drawn from the Supreme Court, the Third Circuit, or a robust consensus of the other Courts of Appeals, *places the question beyond debate* because such precedent, even if not directly on point, *squarely governs* the case at hand.[7] *See Mullenix*, 136 S. Ct. at 308-09; *Reichle*, 566 U.S. at 664; *L.R.*, 836 F.3d at 248.

Given all of this, the "clearly established" standard of the qualified immunity analysis is by its very nature significantly more likely to bar a plaintiff's claim where courts have not previously defined (or often, in actuality have not had the opportunity or obligation to define) with a high degree of specificity the boundaries of the particular claim raised—whether because claims of that nature are rare, or are extremely context- and fact-specific, or present a completely new factual scenario, or—as appears to be the case with Kane's bodily integrity claim here—all of these. And the fact that federal courts have discretion (and as noted above, a preferred exercise of that discretion) to skip the question of whether a plaintiff has alleged a violation of a constitutional right and instead first decide whether such right is "clearly established" only adds to the difficulty.

---

[7] Justice Thomas recently spoke to the daunting barriers erected by the most recent Supreme Court decisions applying qualified immunity to shield public officials in civil rights cases from monetary damages claims brought against them in their individual capacity: "[W]e have 'completely reformulated qualified immunity along principles not at all embodied in the common law.' . . . We apply [the] 'clearly established' standard 'across the board' and without regard to 'the precise nature of the various officials' duties or the precise character of the particular rights alleged to have been violated.' . . . [W]e are no longer engaged in 'interpreting the intent of Congress . . . . Our qualified immunity precedents represent precisely the sort of 'freewheeling policy choices' that we have previously disclaimed the power to make. 'We do not have a license to establish immunities from' suits . . . 'in the interests of what we judge to be sound public policy.' . . . In an appropriate case, we should reconsider our qualified immunity jurisprudence." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1871-72 (2017) (Thomas, J., concurring in part and concurring in the judgment) (citations and quotations omitted). Justice Thomas is not alone in expressing concern regarding the impact of the Court's more recent qualified immunity jurisprudence on the vindication of federal rights. *See Mullenix*, 136 S. Ct. at 315-16 (Sotomayor, J., dissenting) ("[I]t is apparent that the majority's exhortation that the right at stake not be defined at a 'high level of generality' is a red herring.") (citations omitted).

Why? Because when the decisional focus is on whether a right is "clearly established" in a given case rather than on whether the asserted right has been infringed, there is infrequently an occasion for appellate judicial examination and definition of the right itself. The resulting stagnation in the development of legal precedent limits the range of conduct which will have been analyzed and "clearly" defined, one way or another. As a result, federal courts of appeal cases recognizing when new contours of rights have or have not been clearly established and defined with specificity in relation to particular conduct will become increasingly few and far between.

The Supreme Court has acknowledged this difficulty. Writing for the Court in *Camreta v. Greene*, Justice Kagan observed that:

> If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.
>
> But we have long recognized that this day may never come—that our regular policy of avoidance sometimes does not fit the qualified immunity situation because it threatens to leave standards of official conduct permanently in limbo. Consider a plausible but unsettled constitutional claim asserted against a government official in a suit for money damages. The court does not resolve the claim because the official has immunity. He thus persists in the challenged practice; he knows that he can avoid liability in any future damages action, because the law has still not been clearly established. Another plaintiff brings suit, and another court both awards immunity and bypasses the claim. And again, and again, and again. So the moment of decision does not arrive. Courts fail to clarify uncertain questions, fail to address novel claims, fail to give guidance to officials about how to comply with legal requirements. Qualified immunity thus may frustrate the development of constitutional precedent and the promotion of law-abiding behavior.
>
> For this reason, we have permitted lower courts to avoid avoidance—that is, to determine whether a right exists before examining whether it was clearly established. Indeed, for some time we *required* courts considering qualified immunity claims to first address the constitutional question, so as to promote the law's elaboration from case to case. More recently, we have left this matter to the discretion of lower courts, and indeed detailed a range of circumstances in which courts should address only the immunity question. In general, courts should think hard, and then think hard again, before turning small cases into large ones. But it remains true that following the two-step sequence—defining constitutional rights

and only then conferring immunity—is sometimes beneficial to clarify the legal standards governing public officials.

563 U.S. 692, 706-07 (2011) (citations and quotations omitted).[8]

Justice Kagan's observations in *Camreta* have particular force in this case. An analysis of the law surrounding substantive due process bodily integrity claims, like the one Kane raises, is illustrative. The Supreme Court has acknowledged that the substantive due process analysis' conscience-shocking standard lacks precise measurement. *See Cty. Of Sacramento*, 523 U.S. 833, 847-48 (1998). There is "no calibrated yard stick." *Id.* at 847. The inquiry into whether conduct shocks the conscience should be conducted using "the tort law's spectrum of culpability," though it tracks that spectrum of liability only roughly (except in the clearest of cases). *See id.* at 848. Conduct at the most culpable end of the tort law spectrum should be found to shock the conscience, while conduct at the least culpable end of that spectrum should not give rise to liability. *Id.* at 848-49. Conduct anywhere in the middle of the spectrum "is a matter for closer calls." *Id.* at 849. When the circumstances permit public officials the opportunity for reasoned deliberation in their decisions, courts should find the official's conduct conscience-shocking when it evinces a deliberate indifference to the rights of the individual. *Id.* at 851. On the other hand, where circumstances call for hurried judgments in order to protect the public safety or maintain the public order, and thereby render reasoned deliberation impractical, conduct must reach a higher standard of culpability approaching malicious or intentional infliction of injury before courts deem official conduct conscience-shocking. *Id.* at 852-53. In any case, the conduct must be both egregious and outrageous in order to constitute a violation of substantive due process. *Id.* at 847 n.8.

---

[8] In his *Camreta* dissent, Justice Kennedy noted other litigation situations in which a right might be clearly established outside of civil damages actions in which qualified immunity is asserted—Fourth/Fifth Amendment suppression proceedings, in a defense to a criminal prosecution, and in the case of "extreme" but previously unheard-of Constitutional violations—none of which are involved here. *See Camreta*, 563 U.S. at 727-28 (Kennedy, J. dissenting).

In addition, the inquiry into whether official conduct shocks the conscience in a given case is necessarily a context-specific, fact-bound inquiry. *Id.* at 850. It is not "subject to mechanical application in unfamiliar territory." *Id.* "Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *Id.* Indeed, the inquiry is "less rigid and more fluid" than others: "That which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial." *Id.* (citations omitted). In other words, "[t]he exact degree of wrongfulness necessary to reach the conscience-shocking level depends upon the circumstances of a particular case," so "a plaintiff seeking to establish a constitutional violation must demonstrate that the official's conduct 'shocks the conscience' in the particular setting in which that conduct occurred." *Nicini v. Morra*, 212 F.3d 798, 810 (3d Cir. 2000) (quotations omitted).

Given all of the above, it is worthwhile to pause for a moment to consider, as a practical matter, how many stars must align before a plaintiff bringing an otherwise meritorious substantive due process bodily integrity claim (or another meritorious claim with similarly imprecisely-defined boundaries) can sustain his or her lawsuit against a public official for monetary damages in the face of current qualified immunity doctrine. On the one hand, federal law must be (1) so clearly established that (2) every reasonable official (3) would have known at the time of the events at issue (4) that that particular conduct deprived the plaintiff of such right, (5) defined by the forum court with specificity, (6) such that existing precedent drawn from the Supreme Court, the Third Circuit, or a robust consensus of the other federal courts of appeals, (7) places the question beyond debate because such precedent, even if not directly on point, (8) squarely governs the case at hand.

But on the other hand, the boundaries of such a right alleged to have been violated—by the right's very nature—may defy the precise level of measurement seemingly required by the established rules of qualified immunity jurisprudence. And in some instances, rights have not been clearly defined by the relevant courts with the requisite degree of specificity because violations of them are extremely context- and fact-specific, and/or such violations occur in completely new or unexpected factual scenarios.[9]

On top of these broader principles, the decisional law outlining the standard of conduct sufficient to shock the conscience in the context of an invasion of personal bodily integrity by an investigating police officer is sparse and even more fact-specific. Certainly, "[t]he act of sexually assaulting an individual can never further a legitimate governmental interest." *Douglas v. Brookville Area Sch. Dist.*, 836 F. Supp. 2d 329, 350 (W.D. Pa. 2011). But "[n]ot every form of inappropriate or unwanted touching perpetrated by a state official is sufficiently egregious to violate the Due Process Clause." *Id.* at 352 (quotations omitted). Such a violation requires "a serious, as distinct from a nominal or trivial, battery." *Alexander v. DeAngelo*, 329 F.3d 912, 916 (7th Cir. 2003) (collecting cases).

Because the dividing line between simply inappropriate behavior and conscience-shocking behavior as it pertains to the right to bodily integrity in the context of a police investigation in a sexual assault case is—for the reasons noted—often uncertain, defining the right Kane alleges to have been violated takes on special importance in this case.

In her Complaint, Kane formulates Barger's alleged violation of her right to bodily integrity as follows:

---

[9] *But see Hope v. Pelzer*, 536 U.S. 730, 741-42 (2002) (qualified immunity not available to officials who handcuffed a shirtless prisoner to an outdoor hitching post for an extended period, since the right in question was sufficiently defined in the Court's prior, more expansive prison corporal punishment cases so as to give officials "fair warning" of the constitutional violation in the specific context before the Court).

> By taking the inappropriate photographs of the Plaintiff and
> touching the Plaintiff [in the context of the specific facts outlined
> above, *see* Part I], Barger violated the Plaintiff's 14th Amendment
> substantive due process liberty right to be free from
> invasions/intrusions of her bodily integrity. . . . [He] engaged in
> conduct of abuse of power and authority which shocks the
> conscience and/or offends human dignity. . . . Barger not only
> victimized the Plaintiff after she was potentially raped, he then
> abandoned the criminal investigation and did nothing to ensure that
> it was taken over by another agency/entity,[10] which has led to the
> possible crime never being solved. . . . Barger is not entitled to
> qualified immunity because any police officer would know that by
> taking such inappropriate photographs that he was violating the
> Plaintiff's 14th Amendment due process right to be free from
> unreasonable intrusions of her bodily integrity.

ECF No. 1 at 7-8 ¶¶ 70, 71, 68, 75 (footnote added).

The Court concludes that Kane's definition of the right must be read in conjunction with
the specific factual backdrop present in this case. *See Mullenix*, 136 S. Ct. at 308 ("The dispositive
question is whether the violative nature of *particular* conduct is clearly established. This inquiry
must be undertaken in light of the specific context of the case, not as a broad general proposition.")
(citations and quotations omitted). There is little question that the record here would amply support
a finding that the conduct to which Officer Barger has admitted was improper and highly
inappropriate; Kane in essence contends that it might well make up the syllabus for an advanced
course on how to conduct unacceptable police work in the most sensitive of situations and goes on
to argue that Barger's actions raise an inference that they were for his own sexual gratification:

1.  Contrary to Departmental policy, Barger met alone in a private room at the
    police station with someone of the opposite sex who believed they were a
    sexual assault victim;

---

[10] The Court would note that the factual record developed by the parties during discovery—even viewed in a light
most favorable to Kane—does not reveal that *Officer Barger* abandoned the investigation. *See, e.g.*, ECF No. 50-1 at
19; ECF No. 50-4 at 15-18; 50-7 at 17-18. In fact, Barger was removed from Kane's case by then-Police Chief Alan
DeRusso due to his misconduct during the investigation. *See* ECF No. 50-6 at 5-6; ECF No. 61 at 25-26. The crux of
Kane's violation of bodily integrity claim is Barger's alleged conduct in taking inappropriate photographs of Kane
and touching Kane while he was still assigned to the case. However, as noted above, it also does not appear that
Barger's removal was followed by the investigation being reinvigorated by other investigators. For instance, the record
does not reflect that Kane's clothes from the night in question were ever found.

2.      He failed to use official police photo equipment as part of his investigation, using personal gear instead;

3.      He never reported to his superiors that the Department's photo equipment was out of action until he was confronted about his conduct;

4.      While taking the photographs or (depending on which of his stories is believed) attempting to take photographs, he personally and physically manipulated Kane's tank top in the area of her breast and tugged her shorts out and down to expose her upper buttocks rather than relying on Kane to do those things;

5.      He repeatedly asked Kane about injuries to her vagina despite her denial of such, which appear to have induced her to expose her most intimate areas to him;

6.      Contrary to Departmental protocols, Barger's reliance on the expertise and involvement of the sex crimes squad of the County Police was erratic if not nonexistent in this case;

7.      He kept no written records of the chain of custody or disposition of the clothing that he asked Kane to bring to the police station as part of his investigation, and to this day, that clothing remains missing;

8.      Barger at minimum told shifting stories to the Allegheny County Police Detective investigating his conduct about (a) his photography of Kane, (b) the manipulation of her clothing, and (c) his photography of her inner thighs, and he may well have outright lied about such matters; and

9.      Barger's explanation for his evasiveness—that his own girlfriend might become jealous by his taking such photographs as part of an investigation—both rings hollow (would he for that reason not do his job if legitimate police work required such photography?) and plainly mixes personal interests with important police duties.

It is this menu of unprofessional and questionable conduct by Barger that Kane relies on to contend that Barger's conduct violated her right to bodily integrity by creating the inference that his conduct was not investigatory but was instead focused on his fulfilling his personal sexual interests at the expense of her intimate privacy. She therefore contends that this case should press on without the application of qualified immunity.

At the same time, the Court also notes record evidence that if credited might tend to diminish Officer Barger's culpability. Although it was not standard Departmental procedure, there

22

is no evidence that Barger lacked the authority to investigate Kane's possible sexual assault; he was officially assigned to the case. Kane consented to Barger taking a photograph of the bruise on her right buttock. Kane also affirmatively asked if Barger wanted to photograph her other injuries. Kane then proceeded to assist Barger in photographing her other injuries by, for example, pulling down the waistline of her shorts, pulling up the leg of her shorts, repositioning herself to allow for photographing, and holding her tank top strap away from her body. When Barger informed Kane that the photographs were not saving to the phone, Kane agreed to Barger re-taking all of the same photographs. Kane has not testified that her actions in allowing such photographing or assisting in such photographing were anything other than voluntary, or that Barger coerced her to allow such photographing or touching or to assist in it. She has not testified that Barger asked her to expose her vagina to him or that her actions in exposing her vagina to him were anything other than voluntary. And Kane has not testified that her agreement to or assistance in Barger's photographing her or his actions related to such photographing, were under duress due to pressure from Barger due to Barger's affirmative conduct, or due to any combination of Barger's conduct and the pending criminal charges against her. Kane also has not testified that Barger intentionally engaged in any overtly sexual contact with her, whether consensual or non-consensual.[11] Although Kane said Barger repeatedly asked her whether her breasts, vagina, and buttocks were bruised or otherwise injured, Kane has not claimed that Barger did so for the purposes of engaging in either consensual or non-consensual sexual contact with her, nor has she claimed that Barger pressured her verbally or physically to engage in consensual or non-consensual sexual conduct, or said that

---

[11] A possible exception to this is when Kane says she "felt something touch her butt crack" which "caused her to jump" during the photographing, to which Officer Barger responds that he was just moving the tag on the back of her shorts and that he did not touch Kane, intentionally or otherwise. ECF No. 50-1 at 17; ECF No. 50-6 at 15; ECF No. 50-7 at 13; ECF No. 61 at 187-88. But Kane does not deny that Barger's apparent intent was to move the tag on the back of her shorts, nor did Kane testify that she thinks Barger intentionally grabbed her, groped her, or otherwise intentionally touched her without her apparent consent.

she felt pressured to engage in such conduct. And Barger's dishonesty during the investigation into his conduct—while disturbing and indefensible by any measure—does not alter the substance of Kane's own testimony regarding what occurred in the police station that day.

All of that leads the Court to summarize the bodily-integrity right Kane alleges to have been violated as follows: the right for the potential victim of a sexual assault to be free from a police officer's touching of her upper breast and her upper buttocks and an officer's photographing or attempted photographing of various intimate portions of her body during the course of a sexual assault investigation, where the officer had the actual authority to investigate such sexual assault and the stated purpose of investigating it, but conducted such investigation in a manner contrary to Departmental protocols and raising an inference that he did so for his own personal gratification.[12]

With the right so defined, a review of cases outlining the boundaries of bodily integrity claims in the context of police investigations is the next analytical step. In *Schmidt v. City of Bella Villa*, the plaintiff, a 20-year-old woman, was pulled over by the defendant, a male police officer, on suspicion of drunk driving. 557 F.3d 564, 567 (8th Cir. 2009). After the plaintiff gave a false name, the officer arrested her. *Id.* The booking sheet included a section for scars, marks, or tattoos. *Id.* The plaintiff informed the officer that she had a tattoo, and the officer said that he needed a photograph for identification purposes. *Id.* at 567-68. The plaintiff's tattoo was two inches from her hip bone in a location that would require her to unbutton her jeans. *Id.* First, the officer allowed the plaintiff to go into the bathroom and take a photograph of the tattoo. The officer then insisted

---

[12] There is no question that this formulation is extremely precise, and perhaps extraordinarily fact specific, but it appears to this Court that such a granular definition of the involved right is likely what the law requires. *Spady v. Bethlehem Area S.D.*, 800 F.3d 633, 638-39 (3d Cir. 2015), *cert. denied*, 136 S.Ct. 1162 (2016) (defining the involved right as the "right to affirmative intervention by [a] state actor to minimize the risk of secondary or dry drowning" in the context of a high school student's "brief submersion under water, [who] exits the pool and complains of chest pain, is ordered to return to the pool after a several-minute respite, then stays in the shallow end of the pool for the remainder of the class and does not exhibit signs of serious distress more than one hour later").

that the plaintiff's photograph was not good enough, and said that he needed to take a better one. *Id.* at 568. The officer asked the plaintiff to unbutton her jeans and fold them inwards, and the plaintiff acquiesced. *Id.* at 568. The officer again insisted this second photograph was not good enough. *Id.* So he had the plaintiff further unbutton her jeans further and fold them inwards again. *Id.* The court held that the officer's conduct did not violate the plaintiff's right to bodily integrity. *Id.* at 574.

In *Nagle v. McKernan*, the defendant, a fire marshal, appeared at the plaintiff's place of employment to conduct an inspection. No. 07-cv-680, 2007 WL 2903179, at *1 (N.D. Ill. Sept. 28, 2007). The fire marshal handed the plaintiff a note that said, "This is a violation for making me think of you for months. Etched in my memory is your red blouse-filled out nicely-and your flowered skirt which had a hypnotic effect on me when you walked. You were also wearing a black sweater. I'm not sure what you've done to me but [I] walked this whole building just to find you again. I'm sorry if this makes you uncomfortable." *Id.* The fire marshal then told the plaintiff that her place of employment was in violation of code and indicated that she should follow him to the back of the office where the alleged violations were located. *Id.* Once there, the fire marshal leaned against the back of the plaintiff's body and breathed on her while intimately pressing his face against the back of her head and neck. *Id.* The court held that though the fire marshal's behavior was both "strange and inappropriate," his conduct did not violate the plaintiff's right to bodily integrity. *Id.* at *2.

And in *Decker v. Tinnel*, the plaintiff, an 18-year-old woman, went on a police ride-along with the defendant, a police officer, because she was considering a career in law enforcement. No. 04-cv-227, 2005 WL 3501705, at *1 (N.D. Ind. Dec. 20, 2005). The plaintiff alleged that during the ride along, the 29-year-old male officer, who was eight inches taller and 140 pounds heavier than the plaintiff, and who was carrying his gun, began to make comments of a sexual nature to

her. *Id.* He repeatedly asked her if she was 18 and if she would strip for him. *Id.* The officer then leaned over, pushed his face against the plaintiff, and tried to kiss her and "stick[] his tongue down [her] throat"—conduct which the plaintiff says was not consensual. *Id.* The officer then forced his hand between the plaintiff's closed thighs, coming within an inch of her vagina. *Id.* When the plaintiff yelled "no," the officer stopped. *Id.* Later, the officer parked the car and tried to push his tongue down the plaintiff's throat again. *Id.* at \*2. This time, their lips touched before the plaintiff was able to stop him. *Id.* Then, the officer grabbed the plaintiff's chest, placing his whole hand over her breasts. *Id.* The touching was over her t-shirt and lasted about two seconds. *Id.* The court held that "the touching at issue [did] not rise to the level of egregious physical assault[]," and so, while "improper and reprehensible," the officer's "conduct [did] not rise to the level of a constitutional violation" of the plaintiff's right to bodily integrity. *Id.* at \*9.

On the other hand, in *Rogers v. City of Little Rock*, the defendant, a police officer who was in full uniform and carrying his gun, stopped the plaintiff for a broken tail light, and the plaintiff was unable to provide proof of automobile insurance. 152 F.3d 790, 793 (8th Cir. 1998). Standard procedure would have been to have the plaintiff's car towed. *Id.* Instead, the officer followed the plaintiff home in his patrol car and went into her house. *Id.* The plaintiff was still unable to locate her insurance papers, and the officer told her he would let her off but that "she owed him one." *Id.* The officer then started touching and kissing the plaintiff and led her into the bedroom, where the officer told the plaintiff to take off her clothes. *Id.* The plaintiff removed her clothes. *Id.* at 794. The officer then pushed the plaintiff onto the bed and had sexual intercourse with her, covering the microphone on his uniform while the plaintiff yelled out in pain. *Id.* at 794. The court held that the officer's conduct amounted to a violation of the plaintiff's right to bodily integrity that was conscience-shocking. *Id.* at 797.

26

In *Fontana v. Haskin*, the defendant, a highway patrol officer, arrested the plaintiff for drunk driving, handcuffed her, placed her in the back of the patrol car, and took her to jail after the plaintiff was involved in a car accident that left her vehicle off the road. 262 F.3d 871, 875 (9th Cir. 2001). On the way to the station, the defendant officer sat in the back of the patrol car with the plaintiff while another officer drove. *Id.* He told the plaintiff she had nice legs, said he could be her "older man," put his arm around the plaintiff, and massaged her shoulders. *Id.* The officer persisted in this conduct even after the plaintiff asked him to stop. *Id.* The officer remarked on plaintiff's eyes, hair, and body. *Id.* He asked if she had a boyfriend and tried to find out where she lived. *Id.* The plaintiff felt as though she was being driven around town in circles until she accepted the officer's advances. *Id.* Because the officer arrested the plaintiff, the court decided the case under Fourth Amendment seizure jurisprudence. *Id.* at 881-82. But the court held in the alternative that under a Fourteenth Amendment analysis, the officer's behavior "was egregious and outrageous and shocks the conscience as a matter of law." *Id.* at 882 n.7.

And in *United States v. Guidry*, a criminal case, the defendants, two police officers who were in full uniform and carrying their weapons, arrested five intoxicated women, handcuffed them, took them into custody, confiscated their personal belongings, photographed them, and then led them to an isolated room in the police station that was beyond the reach of video surveillance. 456 F.3d 493, 507 (5th Cir. 2006). The officers told the women "it would take awhile" before the women would be free to go, and the officers then "bartered for the women's freedom" and "made sexual advances toward them," saying that they would be willing to forego criminal charges against the women depending on what the women would do for them in return. *Id.* The court denied a sufficiency of the evidence challenge by the officers to their conviction for conspiracy to violate of the women's bodily integrity. *Id.* It held that a reasonable jury could find that the officers'

27

behavior in using their positions of power to intimidate or force the five women to engage in non-consensual sexual conduct shocked the conscience. *Id.*

The Court believes that the facts of record in this case could well lead to the conclusion that, although it did not involve direct sexual contact, Officer Barger's conduct in the course of his duties, considered as a whole, was sufficiently appalling in terms of violating Kane's bodily integrity to be considered conscious-shocking for purposes of the constitutional tort that Kane advances in this case. This is particularly so because the record supports the conclusions that (1) Barger engaged in an extended session involving his efforts to photograph (using his personal cell phone) intimate portions of Kane's body; (2) he did so in a manner wholly contrary to Departmental protocols; (3) when his actions were investigated, he tried to cover them up (including by his lying to outside investigators); (4) he incessantly questioned Kane as to injuries to her vagina leading to Kane's exposure of her vagina to him, even after her repeated denials of any such injuries; and (5) he failed to preserve or even account for critical evidence—the clothing that Kane was wearing during her possible sexual assault. In the ordinary course, on this record, the next step would be a jury trial on Kane's claims.

Considering the conduct to which Barger has admitted, however, and construing as this Court must all of the disputed facts in favor of Kane, even if Kane sufficiently makes out a violation of her constitutional right to bodily integrity, the obstacle to Kane's claim proceeding any further is the exacting standard of the "clearly established" prong of the qualified immunity analysis. The Court concludes that—in light of the law as it stood at the time of Barger's conduct, *see Fields v. City of Philadelphia*, 862 F.3d 353, 361 (3d Cir. 2017), as that law is exemplified by the cases discussed above and the dearth of Supreme Court and Third Circuit decisional law bearing directly on these issues in the context of a police investigation of a reported potential sexual assault—such a violation was not so clearly established that every reasonable police officer

28

in Barger's position would have known that his particular conduct in this case deprived Kane of that right, defined with specificity by existing precedent which squarely governs the case, such that the question is "beyond debate." Simply put, there was not then, and there is not now, a Supreme Court or Third Circuit case that "squarely governs" the matter at hand, nor is there a "robust consensus" in the courts of appeals sufficient to meet this exacting standard in the context of these particular facts.[13] *Id.*; *Mullenix*, 136 S. Ct. at 309.

Given the Supreme Court's increasingly vigorous direction[14] to the lower federal courts as to how they are to assess the circumstances in which qualified immunity is to be applied, this Court is constrained to conclude that it must apply here. When measured against existing precedent from an array of federal courts addressing and defining the right to bodily integrity in police-

---

[13] It does appear from the cases cited above that sexual intercourse by a police officer with a victim or witness during an investigation or arrest would definitely cross that line. What conduct short of that would also do so is for the reasons noted more uncertain.

[14] And the Supreme Court has not been reluctant to express that direction to the district courts, and it has done so in no uncertain terms. In *White v. Pauly*, 137 S. Ct. 548, for example, the Court granted certiorari and reversed the denial of qualified immunity without merits briefing or oral argument, as it has done on other occasions over the past two years. *See Mullenix*, 136 S. Ct. 305; *Taylor*, 135 S. Ct. 2042. In doing so, the Supreme Court observed that it had issued a number of decisions reversing federal courts in qualified immunity cases over the past five years. It then gave a stern reminder to the lower federal courts: "Today, it is again necessary to reiterate the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" *White*, 137 S. Ct. at 552 (citations omitted). Instead, the Court continued, clearly established law must be "particularized" to the facts of the case. *Id.* Although the Supreme Court has said that defining "clearly established law" does not require a case "directly on point," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011), it has also made it plain that the right alleged to be violated must be so clearly established that "every reasonable official would have understood that what he is doing violates that right . . . [and] existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle*, 566 U.S. at 664 (citations and quotations omitted).

Given the Supreme Court's clear and repeated direction to the federal trial courts, the practical reality for litigants in the district courts is that when the constitutional right allegedly violated is, like the right to bodily integrity involved here, a right that is inherently fact-driven and highly context-specific, litigants may well require almost the luck of the draw for there to be Supreme Court or Court of Appeals precedent that is so clear, and so clearly applicable, that every reasonable governmental actor would know that their particular conduct was both unlawful within the particularized facts of the specific case then before the court, and so clearly unlawful that the question is "beyond debate." And while our Court of Appeals has endeavored to announce when a right is to be treated by the district courts in future cases as having been so clearly established, *see Fields*, 862 F.3d at 361-62, even the question of whether such right may have already been "clearly established" is not always beyond debate. *See, e.g., id.* at 363 (Nygaard, J., concurring in part and dissenting in part); *Williams v. Sec'y Pennsylvania Dep't of Corr.*, 848 F.3d 549, 574-75 (3d Cir. 2017) (affirmatively declaring right not to be held indefinitely in solitary confinement to be "clearly established.").

investigative settings that involved sexual and sexually-related contact by a police officer with a victim or witness, this Court simply cannot conclude with confidence that the established law is such that every reasonable police officer in Officer Barger's position would have known that his particular conduct in photographing or attempting to photograph Kane in what is alleged to be a sexually-gratifying manner and in violation of the above-noted professional and Departmental standards during an investigation into her possible sexual assault deprived Kane of that right. *See Mullenix*, 136 S. Ct. at 309 (noting that the violative nature of "*particular* conduct" must be clearly established) (emphasis in original).

\*    \*    \*    \*

The undisputed portion of the record here establishes that Officer Barger's actions while conducting his investigation of Kane's possible sexual assault fell outside of professional law enforcement boundaries as defined by his own Department. His actions in laying down a smokescreen of shifting stories and admitted fabrications when the Allegheny County Police investigated his actions not only diminish the profession in which others are engaged with dedication, but they call all of his explanations (and his motives) into question. That Kane had a right to not have her bodily integrity violated by a police officer investigating her potential sexual assault is without doubt. But equally without doubt is the direction of the Supreme Court to this Court: unless every police officer in Barger's shoes would have known that his actual, specific conduct here was unconstitutional based on prior decisions rendered either by the Supreme Court, the Third Circuit, or a "robust consensus" of federal appeals courts considering cases addressing the particular conduct reflected in this record, this case may proceed no further.

Officer Barger is therefore entitled to qualified immunity in this case.

30

## IV. CONCLUSION

For the reasons set forth above, Officer Barger's Motion for Summary Judgment, ECF No.

48, will be GRANTED. An appropriate Order will issue.

Mark R. Hornak
United States District Judge

Dated: August 17, 2017

cc: All counsel of record